UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ERCOLE RICIOPPO a/k/a/ ERIC RICIOPPO,

                      Plaintiff,

        -against-                           **MEMORANDUM & ORDER**

COUNTY OF SUFFOLK, SUFFOLK COUNTY      Civil Action No. 04-3630
COMMUNITY COLLEGE, THE BOARD OF        (DRH) (WDW)
TRUSTEES OF SUFFOLK COUNTY
COMMUNITY COLLEGE, MICHAEL
HOLLANDER, BRIAN FOLEY, VIVIAN
FISHER, ERIC KOPP and ANTHONY
APPOLARO,

                    Defendants
----------------------------------------------------------X

**APPEARANCES:**

**WOLIN & WOLIN, ESQ.**
Attorneys for Plaintiff
420 Jericho Turnpike, Suite 215
Jericho, New York 11753
By:    Alan E. Wolin, Esq.

**CHRISTINE MALAFI, SUFFOLK COUNTY ATTORNEY**
Attorney for Defendants County of Suffolk, Suffolk County
Community College, The Board of Trustees of Suffolk County
Community College, Brian Foley, Vivian Fisher, Eric Kopp,
and Anthony Appolaro
H. Lee Dennison Building
100 Veterans Memorial Highway
Hauppauge, New York 11788
By:    Chris P. Termini, Esq.

**BERKMAN, HENOCH, PETERSON & PEDDY**, **P.C.**
Attorneys for Defendant Michael Hollander
100 Garden City Plaza
Garden City, New York 11530
By:    Andrew M. Roth, Esq.

**HURLEY**, **Senior District Judge:**

Plaintiff Ercole Ricioppo ("Plaintiff" or "Ricioppo") commenced this action on August 23, 2004 against Defendants County of Suffolk ("County"); Suffolk County Community College (the "College"); the Board of Trustees of Suffolk County Community College ("Board"); Michael Hollander ("Hollander"); Brian Foley ("Foley"); Vivian Fisher ("Fisher"); Eric Kopp ("Kopp"); and Anthony Appolaro ("Appolaro")[1] alleging claims pursuant to 42 U.S.C. § 1983 ("§ 1983"), 42 U.S.C. § 1985 ("§ 1985"), and New York State common law. Specifically, Plaintiff alleges that Defendants violated his right to free speech, equal protection, and due process, conspired to violate his constitutional rights, and breached their contractual obligations pursuant to New York common law. Presently before the Court are motions for summary judgment by Hollander and the County Defendants. For the reasons set forth below, the motions are granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

Plaintiff is a resident of Nassau County, New York. The County is a municipal corporation existing pursuant to the laws of New York. The College is an institution of higher-learning, maintained and operated by the County. The Board is the duly appointed or elected body that constitutes the legally responsible authority of the College. Hollander became a Trustee of the College in 1996; he served as Chairman of the Board from 2002 to 2004. Foley and Fisher were elected legislators of the County, while Kopp and Appolaro served as Chief

---

[1] Defendants County, College, Board, Foley, Fisher, Kopp and Appolaro shall be referred to collectively as "County Defendants." County Defendants and Hollander shall be collectively referred to as "Defendants."

Deputy County Executive and Assistant Deputy County Executive, respectively.

Under New York law, the duties of the President of the College include the formulation and presentation to the Board, for their action, recommendations on "personnel appointments, promotions, tenure, retention and retrenchment . . . ." *See* 8 N.Y.C.R.R. § 604.3(b). By letter dated August 25, 1995, Plaintiff was advised that the Board approved Plaintiff's appointment as Vice President for College and Community Relations effective September 1, 1995. Plaintiff accepted the appointment. By letter dated June 27, 1996, Plaintiff was advised that the Board approved a one-year term appointment as Assistant Professor of Communications/Vice President for College and Community Relations, effective September 1996. Again, Plaintiff accepted the assignment. In January 1997, Plaintiff received notice of and accepted the Board's one-year term appointment, effective September 1, 1997, at the rank of Assistant Professor Communications.[2] In the summer of 1998, Plaintiff received notice of and accepted an appointment "as Vice President for Marketing and Public Affairs, effective September 1, 1998." (Ex. F to Decl. of Chris P. Termini ("Termini Decl.").)[3] He remained in that position until it was abolished effective June 1, 2003 pursuant to resolution of the Board, dated May 9, 2003, which resolution adopted the reorganization plan of non-academic areas proposed by the College's then President Salvatore J. LaLima ("LaLima"). As a vice president, Plaintiff served

_____

[2] Although the 1997 appointment letter does not reference the position of Vice President for College and Community Relations, it is undisputed that Plaintiff continued to function in that capacity.

[3] In his affidavit submitted in opposition to Defendants' motions, Plaintiff asserts that "[s]ince my employment as Vice President commenced, I received regular continuing appointments. Each year I received a letter of continuing appointment from the President." As noted *infra*, the parties agree that a continuing appointment is akin to tenure. Thus, it would appear that Plaintiff is using a term of art inartfully and is referring to letters of appointment.

as an exempt, administrative employee[4] and was not a member of any collective bargaining unit.

      The College has promulgated a "Status and Benefits Handbook" (the "Handbook") for exempt employees "to enable present and future exempt employees to be aware of their rights and benefits." ( Handbook at 2 (the Handbook is Ex. C to the Termini Decl.).) The Handbook, dated November 1982, also provides that: "[i]t should be understood that what follows is a guide and does not substitute for the existing practice. Every attempt has been made to be comprehensive and to correctly state the current practice. The Trustees shall retain the power to change these personnel policies as they deem appropriate." (*Id*. at 3.) The Handbook's enumeration of exempt titles includes that of vice president. (*See id*. at 1.) According to the Handbook, "Administrative Officers entering their sixth year of employment with the College shall be granted continuing appointment. Prior to being given continuing appointment, employees shall be considered on probationary status. . . . The services of employees who have been granted a continuing appointment may be terminated at any time for just cause." (*Id*. at 6.) The handbook also provides that "Administrative Officers are eligible for a sabbatical leave after six (6) years of continuous service. No more than one such sabbatical shall be awarded per year." Administrative Officers "are appointed with academic rank and faculty status and shall retain such along with all attendant rights and benefits" and "[u]pon request made on or after January 1, an Administrative Officer will be granted an assignment the following academic year as a classroom instructor, counselor, librarian or technical assistant provided that a vacancy exists or arises in his/her discipline." (*Id*. at 4-5.)

---

    [4] Exempt administrative employees are sometimes referred to as "Managerial-Confidential Employees" or "Administrative Officers."

4

The parties agree that a "continuing appointment is akin to tenure customarily granted to faculty members of an educational institution." (Hollander's 56.1 Statement ¶21; Pl.'s 56.1 Counterstatement ¶21.) It is undisputed that LaLima never recommended Plaintiff for a continuing appointment and because of the absence of such a recommendation, the Board never granted Plaintiff a continuing appointment. As is discussed more fully *infra,* Plaintiff disputes that a continuing appointment could only be granted upon a recommendation from the College's president; Plaintiff maintains he automatically received a continuing appointment when he commenced his sixth year of employment at the College. (Pl's Mem. at 11-12.)

In the Spring of 2001, Plaintiff informed LaLima of his desire to be granted a sabbatical for the purpose of completing his doctoral dissertation. A resolution for the sabbatical was presented by LaLima to the Board, which failed to approve it. Hollander abstained from the vote. Subsequent to the denial of Plaintiff's sabbatical request, LaLima adjusted Plaintiff's work schedule for the period January through March 2002 in order to provide him the needed time to research, write and defend his dissertation. Plaintiff completed his dissertation in March 2002.

By letter dated May 5, 2003 LaLima recommended to the Board the reorganization of certain non-academic areas of the College's operations, including Community Relations, Governmental Relations and Marketing, areas which were within Plaintiff's job duties and functions during his employment with the College.[5] In that letter, LaLima requested the Board act expeditiously so that he could proceed with the necessary personnel changes by June 1, 2003,

---

[5] According to LaLima, he devised the reorganization to address concerns raised by Hollander that something had to be done about Plaintiff because "there were problems developing with some legislators and county management personnel" and also to "be consistent with SUNY non-personnel recommendations regarding the College's Foundation (NB: Its fundraising arm)." (LaLima Aff. ¶ 12.)

providing the summer months for staff to adjust to the recommended changes. (Termini Decl. Ex. H.)

La Lima's reorganization proposal included the creation of the office of "Institutional Advancement," headed up by a vice president or an executive director who would report directly to the president and would take on full responsibility for all fund raising campaigns, grants, alumni affairs and community relations. LaLima also made a number of other recommendations. With respect to the areas within Plaintiff's job duties, LaLima recommended that community and governmental relations no longer be combined with marketing operations as they needed much closer attention. Under LaLima's proposal, community relations would be coordinated by the individual in charge of the newly created Institutional Advancement office and governmental relations would be the responsibility of the president's executive assistant. With community and governmental relations reassigned to others, the duties of vice president for marketing and public affairs would be significantly reduced. Hence, LaLima recommended that position be replaced with a narrower management position titled "Administrative Director of Marketing Services" which would report to the executive director for enrollment management. La Lima's proposal further recommended that "the incumbent vice president be given the opportunity to apply for the new position of 'Administrative Director of Marketing Services' . . . [a] position . . . three pay grades lower than that of vice president which is commensurate with the reduced responsibilities." (Termini Declar, Ex. H at 3.)

Prior to taking any action, LaLima and the Board sought and elicited opinions from the College's Vice President for Legal, Planning and Information Services and the Suffolk County Attorney's Office concerning "the legal issues associated with the intended termination of an

exempt (managerial-confidential, non-union) employee." (Memorandum to LaLima from Vice President for Legal, Planning and Information Services (Ex. G to Hollander Aff.); *see also* Memorandum to Hollander from Suffolk County Attorney (Ex. H to Hollander Aff.)). Hollander, and presumably the entire Board, was advised that Plaintiff could be terminated. According to the written memorandum of the College's vice president for legal affairs, Plaintiff was "an at-will employee in the administrative position with no rights to transfer to an academic position. An at-will employee has no right to a hearing prior to dismissal, nor does cause have to be shown." (Memorandum to La Lima from Vice President for Legal, Planning and Information Services (Ex. G to Hollander Aff.).) The Suffolk County Attorney also issued a written opinion in which he stated that "absent the entitlement to the protections afforded by a collective bargaining agreement or other proof that continuing employment or tenure has been granted, managerial-confidential employees serve at the will of the Board of Trustees" and that he concurred in the opinion of the College's vice president. (Memorandum to Hollander from Suffolk County Attorney (Ex. H to Hollander Aff.).) Plaintiff disputes the validity of these opinions.

The Board approved the reorganization plan. (*See* Ex. I toTermini Declar.) Plaintiff did not receive the newly created position of administrative director of marketing services. According to LaLima, Hollander advised him that since LaLima's successor had been selected, the incoming president-designate would select the candidates to fill the new positions recognizing that they would eventually be working in her administration. Nor did Plaintiff receive an academic appointment although he states that he requested that he be transferred to another vacant position as a member of the Communication Arts faculty.

According to Plaintiff, the elimination of his position and his termination was the culmination of retaliatory acts undertaken by Defendants as a result of Plaintiff's criticism and opposition of "certain practices and opinions undertaken and expressed by the Office of the Suffolk County Executive, including Defendants Kopp and Appolaro, certain members of the Suffolk County Legislature, including Defendants Foley and Fisher, Defendant Hollander and other members of Defendant Board as it related to [the College's] affairs." (Ricioppo Aff. ¶ 22.) The other retaliatory acts include: (1) members of the Legislature, including Foley and Fischer, "made false allegation' against [him] and caused [his] alleged conduct to be the subject of inquiry by the county legislature; (2) beginning in 2001, Fischer "publicly berated" him; (3) his request for a sabbatical was improperly denied, with Foley and Fischer attending the Trustees' meeting and lobbying against it; (4) in or about September 2001, Hollander and the Board "sought to have the President of [the college] impose an unprecedented Peer Review of [Plaintiff]"; (5) in April 2003, Hollander moved to usurp Plaintiff's "role as College spokesperson . . . [and] directed [Plaintiff] not [to] have any more contact with the media and that [Plaintiff's] subordinates were to deal with him - Defendant Hollander;" and (6) in April 2003, Hollander had Plaintiff removed from the College President's retirement party committee. (*Id*. ¶¶ 45-52.)

Plaintiff offers the following "speech" as causing the retaliatory conduct:

1. The Use of Suffolk Life:   Beginning in 1997 Plaintiff used a newspaper entitled "Suffolk Life" to distribute the College's course material and to otherwise publicize the college. Suffolk Life had a strained relationship with the office of the County Executive and certain legislators, including Foley and Fischer.  Although the use of Suffolk Life to promote the college

went well, in August 1999 Plaintiff was summoned to a meeting in the Office of the County Executive at which Kopp and Appolaro and two College Board members were present and told to eliminate advertising in Suffolk Life. Despite Plaintiff's objection, he was directed to curtail advertising because the College needed the County Executive's support. Plaintiff "then curtailed some advertising in 'Suffolk Life' but continued using it to distribute the course schedule." In January 2000 Plaintiff learned through a conversation with one "Sally Slack" that Kopp and Appolaro continued to be annoyed that the course schedules were appearing in Suffolk Life. In August 2000, a legislative meeting was held at the College and legislator Paul Tonna stated, in Plaintiff's presence as well as the presence of some Trustees, that if the College did not cease advertising in Suffolk Life its marketing budget would be withheld. Plaintiff "voiced my strong displeasure to Legislator Tonna and told him that [he, Plaintiff,] on behalf of [the College] should be able to market the College the way [he] saw fit." Because of the pressure placed on the College by the Office of the County Executive and despite Plaintiff's objections, Plaintiff was forced to cease all operations with Suffolk Life. (Ricioppo Aff. ¶¶ 23-32.)

2. New York Sports Scene: In August 2002, Plaintiff was "vocal in opposing the wishes of Defendant Hollander to have the College advertise in New York Sports Scene, a publication published by Hollander's personal friend." Plaintiff told Hollander that advertising in that publication "would be an improper use of public funds and would not benefit [the College]. (*Id*. ¶¶ 33-34.)

3. Criticism of Hollander: Plaintiff states that he expressly and publicly criticized other practices of Hollander, "including usurping authority, including that of the President of [the College]; and functioning in a way that was outside his authority as a member of Defendant

board and for engaging in unethical and illegal actions." Plaintiff provides only the following examples. Hollander directed Plaintiff to join the Long Island Convention and Tourism Bureau, which membership was not budgeted and, according to Plaintiff, would provide no benefit to the College. Plaintiff publicly opposed Hollander's direction to place an advertisement in a charity journal that Hollander's wife had an interest in. Plaintiff states he was also critical of Hollander's spending techniques - Hollander directed college personnel to spend money, directions which were outside his jurisdiction as a single Trustee. For example, Hollander directed an College employee to purchase a printer for the College Library and the repair of equipment at the Western Campus of the College. (*Id.* ¶¶ 35-39.)

4. Miscellaneous Matters: Plaintiff asserts that he "was also publicly at odds with certain faculty Unions; while Defendant Hollander, the Suffolk County Executive's office and certain legislators, including Defendants Foley and Fischer, sought to promote the Unions' interest. In fact, during 1998-1999 Defendant Foley had publicly clashed with [Plaintiff] because [Foley] wanted to remove the College's marketing budget and earmark the money to hire new faculty." Further, "at the same time [he] opposed certain practices and opinions, [Plaintiff] refused to participate in the questionable and unlawful activities, despite being asked to do so by enumerated individual Defendants." (*Id*. ¶¶ 42-43.) Plaintiff does not, however, specifically identify the referenced "practices and opinions" or "unlawful activities." (*See id.*)

5. The May 2, 2003 Memo: Plaintiff also points to a May 2, 2003 memorandum he wrote to LaPima.[6] In that Memorandum, Plaintiff refers to Hollander's orchestration of a plan to remove Plaintiff allegedly in retaliation for Plaintiff's refusal to place the advertisement in

---

[6] The May 3, 2003 Memo is Termini Decl., Ex. T.

Hollander's friend's magazine, and Plaintiff's "attempts to prevent unethical and illegal actions" of Hollander at the College's Health, Sports, and Education Center.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines,*

*Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of

the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

Finally, the Court notes that a party's burden on summary judgment is not satisfied by the wholesale submission of depositions and documents. Rather, it is incumbent upon the parties to particularly direct a court's attention to the specific portion of a deposition or specific document that it wishes a court to consider. Concomitantly, it is only those portions of the record

submitted in connection with a motion to which the court's attention is specifically directed, that the court is obligated to consider in determining whether a material issue of fact exists. In other words, a court is not obligated to hunt through depositions, submitted in bulk, in an effort to identify factual disputes. "[I]t is the duty of the parties, not the court, to sift through the record and bring to the court's attention the pertinent information that may create or defeat a triable issue of fact." *McDonald v. Gonzales*, 2007 WL 951445, *4 (N.D.N.Y. Mar. 27, 2007) (citing *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002); *Monahan v. N.Y. City Dep't of Corrections*, 214 F.3d 275, 291 (2d Cir. 2000)); *see also Downes v. Beach,* 587 F.2d 469, 472 (10th Cir.1978) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.").

## II.    The Claims Against Kopp and Appolaro

Prior to addressing the substantive challenges posed by Defendants to Plaintiff's claims, the Court shall address the contention of Defendants Kopp and Appolaro that the statute of limitations bars the claims against them.

Kopp and Appolaro argue that because the statute of limitations for §1983 and §1985 claims is three years, *see Paige v. Police Dep't of Schnectady*, 264 F.3d 197, 199 n.2 (2d Cir. 2001) and the only conduct allegedly engaged by them occurred in 1999, more than three years prior to the filing of the instant action on August 23, 2004, the claims against them should be dismissed on statute of limitations grounds. Plaintiff responds that because he experienced "a continuous practice and policy of discrimination" he can bring suit challenging all conduct that was part of the pattern, even conduct that occurred outside the limitations period. " (Pl. Opp.

14

Mem. at 22.)

The Court need not reach the statute of limitations argument, however, because there is no evidence, or even any allegation in the complaint, that Kopp or Appolaro participated in any of the alleged acts of harassment or retaliation and that deficiency provides an independent basis for awarding them summary judgment.

In order to make a claim for individual liability under § 1983, there must be personal involvement. *Patterson*, 375 F.3d at 229; *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006) (to establish First Amendment retaliation claim, plaintiff "must show each defendant ' was personally involved . . . in the alleged constitutional deprivations.'") (ellipses in original) (citing *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005)). Personal involvement requires a demonstration of "some affirmative link to causally connect the actor" with the claimed violation. *Patterson*, 375 F.3d at 229 (citing *Whidbee v. Garzarelli Food Scpeialities, Inc.,* 223 F.3d 62, 75 (2d Cir. 2000)).

The only factual allegations contained in the complaint with respect to Defendants Kopp and Appolaro are as follows. Plaintiff met with them in August 1999 at which time Kopp "expressed anger and annoyance at Suffolk Life's continued criticism of the Suffolk County Executive and directed Plaintiff to eliminate the advertising with Suffolk Life" and Plaintiff refused to eliminate the advertising. (Compl. ¶ 36-37.) Plaintiff was directed by the Board to curtail advertising because the College needed the County Executive's Support. Plaintiff curtailed some advertising but continued using Suffolk Life to distribute the course schedule and "[i]n or about January2000, Plaintiff learned . . . that Defendants Kopp and Appolaro continued to be annoyed that the course schedules were still appearing in Suffolk Life." (Compl. ¶ 40.)

"Because of the pressure placed upon Defendant SCC by the Office of the County Executive and members of the Legislature, Plaintiff, despite his objections, was forced to cease all operations with Suffolk Life. (Compl. ¶ 42.) These same allegations are repeated in Ricioppo's affidavit. *See* Ricioppo Aff. at 26 - 32. While the Complaint (as well as Ricioppo's affidavit) goes on to assert that "in direct response to Plaintiff's exercise of his protected rights, Defendants undertook a pattern of harassing and undermining Plaintiff's position," not one of the enumerated acts is alleged to have been perpetrated by either Kopp or Appolaro. (*See* Compl. ¶¶ 56-64; Ricioppo Aff. ¶¶ 44-53.) There being no causal link between the actions of Kopp or Appolaro and the claimed violation, the requirement of personal involvement has not been met.

The motion of Kopp and Appolaro for summary judgment is granted.

## III.    First Amendment Claims

In order to establish a First Amendment retaliation claim, an employee must prove that: "(1) [he] engaged in constitutionally protected speech . . .; (2) [he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds, Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008). In determining whether a public employee engaged in constitutionally protected speech, a court must determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* If the answer is yes, a court must then determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.; see also Ruotolo v. City*

*of New York*, 514 F.3d 184, 188 (2d Cir. 2008).

The courts have recognized that while the First Amendment protects employees' speech in certain circumstances, it does not permit employees to "constitutionalize the employee grievance." *Garcetti*, 547 U.S. at 418. "Although a public employee 'does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment,' these rights are not absolute, because the public employer has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services. *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)); *see also Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

"Recognizing that government employers (like private employers) 'have heightened interests in controlling speech made by an employee in his or her professional capacity,' the Supreme Court ruled that a public employee speaking in his official capacity is not speaking as a citizen for First Amendment purposes, and employer retaliation for such speech does not justify the 'displacement of managerial discretion by judicial supervision.'" *Ruotolo*, 514 F.3d at 189 (quoting *Garcetti*, 547 U.S. at 422). "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti,* 547 U.S. at 421; *see also Williams v. Dallas Ind. School Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) ("Even if the speech is of great social importance, it is not protected by the First Amendment so

long as it was made pursuant to the [public] worker's official duties.").

Thus, "in *Garcetti*, the Supreme Court clarified that the threshhold question in First Amendment public speech cases is two-fold. First, in determining whether the speech in question is protected, the district court must decide whether the plaintiff was speaking "as a citizen. . . . Second, if the court determines that the plaintiff was speaking as a citizen, it must then conduct the analysis set forth in *Connick* [*v. Meyers*, 461 U.S. 138, 154 (1983)] and establish whether, 'viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon matters of public concern.'" *Mulcahey v. Mulrenan*, 2008 WL 110949 (S.D.N.Y. 2008) (citations omitted). *Accord Skehan*, 460 F.3d at 105-06 (if a public employee is not speaking pursuant to his official duties, the court must determine whether the speech relates to a matter of public concern, whether the employee suffers adverse employment action and whether the speech was a motivating factor in the employment action taken). Whether speech is protected is a question of law for the court, not a question of fact. *Connick*, 461 U.S. at 148 n.7.

The *Garcetti* Court did not "articulate a comprehensive framework" for determining whether an employee's speech is pursuant to his official duties, as opposed to as a citizen. The Court did note, however, that the test is a "practical one" and public employers "cannot restrict employees' rights by creating excessively broad descriptions." *Garcetti*, 547 U.S. at 424. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes. *Id.* at 424-25.

18

With respect to whether speech is on a matter of public concern, a court must "tak[e] into account the content, form, and context of a given statement as revealed by the record as a whole.' . . . The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (quoting *Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999)).

> The question of what is a matter of public concern is not amenable to a simple, definitive answer. Nonetheless, *Connick* provides some guidance. It directs courts to examine the "content, form, and context of a given statement, as revealed by the whole record' in assessing whether an employee's speech addresses a matter of public concern. . . . In addition it notes that the standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present. . . . that standard is established by our decisions in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469 . . . and *Time Inc. v. Hill*, 385 U.S. 374, 387-88 . . . . These cases make clear that *public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.*

*Piscottano v. Murphy*, 511 F.3d 247, 270 (2d Cir. 2007) (emphasis in original) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (citations omitted). Moreover, "retaliation against the airing of generally personal grievances is not brought within the protection of the first amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern.'" *Ruotolo,* 514 F.3d at 190 (brackets in original) (quoting *Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)).

With these principles in mind, the Court shall proceed to examine Plaintiff's First

Amendment claim. According to Defendants, they are entitled to judgment because (1) Plaintiff was not speaking as a citizen; (2) the speech was not on matters of public concern; and (3) there is no causal connection between the speech and the adverse employment action.

Plaintiff's duties as Vice President for Marketing and Public Affairs "included acting as a liaison between [the College] and the Suffolk County Legislature and designing marketing programs." (Ricioppo Aff. at ¶ 5; *see also* Hollander 56.1 Statement ¶ 35 ("The areas of Community Relations, Governmental Relations and Marketing were within Plaintiff's job duties and functions during his employment with the College.")). "More specifically, Plaintiff was responsible for publicizing [the College] and for publishing the [C]ollege's course catalog. It was also Plaintiff's job responsibility to communicate with members of the Suffolk County Legislature on budgetary matters and matters of constituent concern. Plaintiff often appeared before the legislative committees in order to implement marketing programs, for budgetary matters, and to address legislative concerns." (Amended Comp. (Ex. B. toTermini Declar.) at ¶24.)

It is readily apparent that Plaintiff's speech regarding Suffolk Life was in the course of Plaintiff's official duties and not as a citizen. Plaintiff's official duties included both publicizing the College and publishing its course catalog and his clash with various Defendants over Suffolk Life related to his use of that publication for both these official purposes. Indeed, the official nature of Plaintiff's speech is demonstrated by his assertion to a County Legislator, regarding the use of Suffolk Life, that "[he, Plaintiff] on behalf of [the College] should be able to market the College the way [he] saw fit." Ricioppo Aff. ¶ 31. As Plaintiff's Suffolk Life speech was in the course of his official duties, it cannot form the basis of a First Amendment claim.

Similarly, Plaintiff's speech opposing advertisement of the College in "New York Sport Scene" and a charity journal, as well as the College's membership in the Long Island Convention and Tourism Bureau falls within his official duties. The nature of each of these items relate directly to Plaintiff's responsibility for marketing and/or publicizing the College. That Plaintiff claims these items constitute improper use of College funds does not change this result. "While Plaintiff's official duties . . .may not have included raising concerns about perceived improprieties, the Court finds that Plaintiff has an ad hoc responsibility to report any irregularities . . . on a project [falling within Plaintiff's duties]." *Morgenstern v. County of Nassau*, 2008 WL 4449335, *12 (E.D.N.Y. Sept. 29, 2008).

Turning then to Plaintiff's speech that was "at odds with certain faculty Unions," the only specific instance Plaintiff directs the Court's attention to is an incident in 1998-99 when he and Foley clashed because "[Foley] wanted to remove the college's marketing budget and earmark the money to hire new faculty." Given that the incident related to the elimination of the marketing budget and Plaintiff's official duties encompassed both marketing and the communication with members of the legislature on matters of budgetary concerns, the only conclusion to be drawn is that this speech was also during the course of Plaintiff's official duties.

With respect to the May 2, 2003 Memorandum from Plaintiff to LaPima, the Court concludes that, even if the Memorandum was not part of Plaintiff's official duties, it is not protected speech because it was not on a matter of public concern. Plaintiff's memorandum was manifestly calculated to address his personal grievance, i.e., his termination. The memorandum starts out with "I am sure you have heard the rumors circulating about Michael Hollander's efforts to have me removed from my position as Vice president for Marketing Affairs." (May 2,

21

2003 Memorandum from Ricioppo to LaLima (Ex. P to Termini Declar.))   After recounting

Hollander's alleged efforts to  gather support for Plaintiff's termination and to usurp his

authority, the memorandum continues on to state that "there are no legitimate grounds for Mr.

Hollander to pursue my dismissal." (*Id.*)  It concludes with the following 'I understand that Mr.

Hollander has said that he will continue his campaign against me until he finds a way to have me

removed.  Naturally, I am concerned that this situation is threatening my career.  I would

appreciate your guidance in this matter." (*Id.*)  These illustration make readily apparent that the

memorandum was not a subject of legitimate news interest but rather was to address personal

grievances.

        The last item of speech to be addressed is Plaintiff's alleged criticism of Hollander's

spending techniques, i.e. Hollander directions in 2003 to a College employee to purchase a

printer for the library and to repair certain equipment - directions Plaintiff contends were "outside

Hollander's jurisdiction as a single Trustee."  In order to determine whether that speech was

within Plaintiff's official duties and on a matter of public concern, the Court examined the record

for the "content, form, and context" of the speech.   The following excerpt from Plaintiff's

deposition is illuminating.

> Q:      What year were we in?
> A:      It must have been in 2002. Yes 2002 – early 2003 maybe. . . .
> Q:      What was your source of information regarding this printer?
> A:      That was presented by someone else at the Executive Counsel meeting.
> Q:      It was an Executive Counsel meeting?
> A:      Correct.
> Q:      You were there?
> A:      Yes, I was.
> Q:      Who presented what to who?
> A:      I believe it came by the Executive Dean.  At the time, I believe it was John Fry
>         who voiced his displeasure over Mr. Hollander's actions.

. . .

Q:     You said Pry.  You addressed him?

A:     Mr. Pry mentioned it during the meeting.  There were a lot of complaints about Mr. Hollander.

Q:     So, this group or individual was unhappy about the purchase of the printer?

A:`    No, he was unhappy that a Trustee directed the purchase of a printer that did not come under his jurisdiction.  In other words, he's responsible for his campus – an individual Trustee has no authority to direct the purchase of the equipment.

Q:     This has nothing to do with you and your department?

A:     Right.

Q:     You had heard that he had managed to order or get a printer under someone else's watch, so to speak?

A.     Correct.  This was going on for months, not only in my department but throughout the college.

Q:     This was the complaint that you heard?

A:     Correct.

Q:     You happened to be there, and Mr. Pry had complained that Hollander had gotten a printer in a way his department should have acted I assume.

A:     Well, he should have been the one authorizing it, not the Trustee.

. . .

Q:     You knew nothing about the scenario of the printer itself?

A:     I just heard about it in the complaint at the meeting.

Q:     Well what was said by the rest of those members?

A:     Well the rest of the members voiced their concerns about the repeated interference in the college operations.  The President was very vocal about it.

. . .

Q:     Then you said that Mr. Hollander also directed the repair of equipment at the Western Campus?

A:      Right.

Q:     Was that at the same meeting or a different meeting?

A:     That  was probably the subsequent meeting.  It might have been shortly after. Again, that was voiced by the Executive Dean of the Western campus.

Q:     Do you know what equipment they were talking about?

A:     About computer equipment.

Q:      That would be for the use of students or professors at the college?

A:     Correct.

Q:     Nothing to do with the personal use of Mr. Hollander.

A:     No.

Q:     Neither did the printer over at the college library.

A:     Right

Q:     This would be for the usage of the students or professors at the college?

A:     Right.

. . .

Q:      Have you ever spoken to Chuck Stein about it?
A:      About my displeasure at his interference, sure.  I spoke to Chuck Stein.  I spoke to Mr. LaLima.  I spoke to Executive Counsel.  I was very vocal about it.

(Ricioppo Dep. (Ex. C to Hollander Aff.) at 157-163.

Plaintiff's deposition testimony makes clear that there is no claim that the repair or the printer were unnecessary or for the private use of Hollander and thus constituted a squandering of public funds.  Rather, the thrust of Plaintiff's comments was that Hollander injected himself into some minor administrative matters which were the responsibility of college administrators, not trustees, to address.  That a trustee may have trespassed on someone else's duties and, in the process, exceeded his own authority, may be of some interest to some members of the public but that does not make it a matter of public concern for First Amendment purposes.  *See Ruotolo*, 514 F.3d at 190; *Ezekwo v. N.Y. City Health & Hosp. Corp.*, 940 F.2d 775, 780-81 (2d Cir. 1999) (rejecting claim that speech impugning hospital director's skills as a doctor, teacher and an administrator is a matter of public concern).  Moreover, Plaintiff's complaint was not divorced from his job as Vice President of Marketing and Public Affairs charged with, inter alia, responsibility for "budgetary matters" involving his department.  (Amended Comp., Ex. B to Termini Declar., at ¶ 24; *see also* Ricioppo Dep. at 158:23-24 ("This [referring to Hollander's purported interfering in college administrative matters] was going on for months, *no only in my department* but throughout the college.") (emphasis added). )

The decision in *Ezekwo* is instructive.  The *Ezekwo* plaintiff was an ophthalmology resident at a New York City Health and Hospitals Corporation hospital who commenced an action alleging, inter alia, that she was denied the position of chief resident because she exercised her First Amendment rights. She had authored a series of letters and memoranda relating to "(1)

24

the failure of attending physicians and lecturers to be present at scheduled times, (2) the manner in which she was treated by [the program's director]; (3) the manner in which [the program director] evaluated her performance, (4) her lack of opportunity to perform surgery, (5) the lack of personal attention she received from attending physicians, (6) the lack of proper hospital maintenance, (7) [the program director's] poor management and motivational skills, and (8) the poor teaching methods of the attending physicians." *Id.* at 777-78. Although concerns about the competence or skill of a hospital administrator would presumably be of some interest to the public at large, the Second Circuit affirmed the district court's holding that the statements did not address matter of public concern. The Second Circuit stated:

> Our review of her prolific writing convinces us that Ezekwo was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor. As the *Connick* [*v. Myers*, 461 U.S. 138 (1982)] Court succinctly observed :
>
>> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark - and certainly every criticism directed at a public official would plant a seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.
>
> Id. at 149, 103 S. Ct. at 1691. The district court correctly reasoned that the mere fact that one or two of Ezekwo's comments could be construed broadly to implicate matters of public concern, does not alter the general nature of her statements. As the *Connick* Court emphasized:
>
>> We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in

> reaction to the employee's behavior.  Our responsibility is
> to ensure that citizens are not deprived of fundamental
> rights by virtue of working for the government; this does
> not require a grant of immunity for employees grievances
> not afforded by the First Amendment to those who do not
> work for the State.

940 F.2d at 781.

Here, as in *Ezekwo*, the speaker was not on a mission to protect the public welfare.  As noted earlier, there is no claim that the repair or equipment were unnecessary or for Hollander's personal use, or that his action could endanger anyone.  Rather, it was simply a matter of complaining to his peers and the College President that it was someone else's, not Hollander's, job to order the equipment and the repair; a matter fairly characterized as an  internal office matter.  As such Plaintiff's speech was not on a matter of public concern.  *See generally Hellstrom v. U.S. Dep't of Veterans Affairs*, 46 Fed. Appx. 651, 655 (2d Cir. 2002) (rejecting argument that "comments on the performance and integrity of a highly visible public official are unquestionably issues" of public concern; rather, content of speech must be viewed in context to determine if it is of public concern); *Rafiy v. Nassau County Med. Ctr.*, 218 F. Supp. 295, 306-07 (E.D.N.Y. 2002) (observing that "where the speech uttered by the employee relates simply to a disagreement or a criticism of the employer as boss, it is unlikely the speech will be protected.").

Having determined that the evidence proffered by Plaintiff , construed in his favor as it must be, is insufficient to sustain a claim for First Amendment Retaliation because his speech was either not as a citizen or not on a matter of public concern, Defendants' motions for summary judgment on said claim is granted.

**IV.    Due Process - Substantive**

County Defendants have moved for summary judgment on Plaintiff's substantive due process claim arguing that the Amended Complaint fails to add anything to the original complaint which this Court found inadequate.   The Court agrees.

Substantive due process rights are violated only when the government has engaged in conduct so egregious it "shocks the conscience."   *Rochin v. California*, 342 U.S. 165, 172 (1952).   The Supreme Court has "been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended."   *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).   Conduct that is merely "incorrect or ill-advised" does not meet this standard.   *See Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994).

As the Court stated in its earlier decision in this case:

> Even if all of Plaintiff's factual allegations were true, there is nothing in the Complaint that rises to the level of "shocking the conscience."   Even if Plaintiff lost his job and was subjected to a peer review as a result of exercising his First Amendment rights, such actions do not "shock the conscience" in a manner that typically raises constitutional concerns.   *Cf. Scatorchia v. County of Suffolk*, 01 Civ. 3119 (TCP), 2006 WL 218138, *4 (E.D.N.Y. Jan. 24, 2006) ("[E]ven if the touch was a battery, it would not violate her substantive due process rights."); *Bennett v. Pippin*, 74 F.3d 578 (5th Cir1996) (finding that conduct "shocked the conscious" where a sheriff raped a murder suspect); *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989) (finding, in the sexual harassment context, that conduct "shocked the conscious" where a teacher committed multiple sexual assaults on his high school students).   The scant factual allegations are an inadequate predicate for "shocking the conscience."

Memorandum & Order, dated March 31, 2006, at 13.

Plaintiff fails to specify how the record before this Court creates an issue of fact as to his substantive due process claim. Plaintiff's assertion that "[u]nder the facts presented herein, [he] has set forth a claim under substantive due process," (Pl. Opp. Mem at 14), is insufficient to meet his burden on the instant motion. Summary judgment is granted in favor of Defendants on the substantive due process claim.

## V.     Due Process - Procedural

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Property interests are both created and defined by "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Individuals who have been granted tenure, whether pursuant to state law or contract, have a constitutionally protected property right in that status that cannot be deprived without due process. *Id.; DeMichele v. Greenburgh. Cent. Sch. Dist. No. 7*, 167 F.3d 784, 789 (2d Cir. 1999).

Plaintiff's procedural due process claim is two-fold. First, Plaintiff contends that he automatically received tenure pursuant to the Handbook when he entered his sixth year as vice president and "[u]nder these circumstances [his] employment could only have been terminated for "just cause" under paragraph 10. The abolishment of plaintiff's position, quickly followed by the creation of a similar position was nothing more than a pretext. Because plaintiff could only be terminated for 'just cause' some process was required." (Pl. Opp. Mem. at 12.) Second, he contends "Defendants also violated [his] vested rights when they failed to appoint him as a

28

classroom instructor, despite his [request] and despite there being a vacancy in his field."

Plaintiff's claim to tenure (i.e. "a continuing appointment") is grounded solely, to use his terminology, on the "literal"[7] terms of paragraph 9 of the Handbook which states in relevant part "Administrative Officers entering their sixth year of employment with the College shall be granted continuing appointment."[8]  However, the Handbook also provides that it is a "guide and does not substitute for existing practice."  Further, [t]he Trustees shall retain the power to change these personnel policies as they deem appropriate."  (Handbook ( Ex. C to Termini Decl.) at 3.) And the "existing practice" at the College, as explained *infra*, was that an individual who "was in his fifth year as a probationary employee . . . would be *eligible* for a continuing appointment upon entering his sixth year" as distinct from entitled to such an appointment.  *Barham v. Suffolk County Community College*, 5 A.D.2d 415, 416 (2d Dep't 2004) (emphasis added).

Defendants have submitted evidence that for the relevant period the practice of the Board regarding continuing appointments was that it was solely within the president's discretion whether or not to recommend an exempt employee for such an appointment.   "The President would recommend candidates for continuing appointment to the Board who was then charged with approving same in order to be effective . . . .  If the president's recommendation was

---

[7] *See* Pl.'s Mem. in Opp. at 12.

[8] Plaintiff's reliance on the doctrine of tenure by estoppel is misplaced.  Under that doctrine, courts have granted tenure to teachers and administrators employed by school boards when the board has not acted to grant tenure but has continued the teacher's/administrator's employment after the expiration of the probationary period with full knowledge and consent.  *See Gould v. Bd of Educ.*, 81 N.Y.2d 446 (1993).  Tenure by estoppel is grounded in provisions of the New York Education Law which by their terms only apply to teachers and administrators employed by school boards, *see generally id.*  Plaintiff does not cite, and this Court is not aware of, any case that applies the concept of tenure by estoppel to the collegiate level.

approved, the exempt employee's status would be changed from what . . . was an at will employee, terminable . . . with or without cause, to an employee who, for lack of a better term had received tenure. " (Hollander Aff. ¶¶ 10 -12.) That a recommendation of the College president, approved by the Board, was required for the grant of a continuing appointment is confirmed by the Board Resolutions submitted to the Court. *(See* Ex. G to Termini Decl.) Plaintiff has submitted no evidence to the contrary. In fact, Plaintiff's deposition testimony demonstrates that his understanding of continuing appointments was that they required a recommendation from the President and approval by the Board. (*See* Ricioppo Dep. (Ex. C to Hollander Aff.) at pp. 30-31.) Moreover, conspicuously absent from the affidavit of LaLima, submitted on behalf of Plaintiff, is any assertion that a continuing appointment was automatic upon an exempt employee's entry into the sixth year of employment and did not require either the president's recommendation or the Board's approval. LaLima's assertion that "Mr. Ricioppo's name never appeared on any [list compiled of employees eligible and recommended] for tenure or faculty appointment," (LaLima Aff. ¶ 18) is insufficient to create any issue of fact. [9]

The Court now turns to Plaintiff's claim that he was entitled to an academic appointment. Defendants maintain they are entitled to judgment on this claim pointing to the fact that the record before this Court demonstrates that Plaintiff received *one year appointments* as "Assistant

---

[9] Moreover, Plaintiff was terminated as result of the abolishment of his position pursuant to the reorganization plan proposed by LaLima and tenure does not protect against the elimination of positions. *See Mitchell v. Bd. of Ed. of Great Neck Pub. Sch.*, 40 N.Y.2d 904, 905 (1976). Plaintiff has failed to provide any evidence that assuming he had tenure, that status gave him a property interest in either of the newly created positions, i.e. Administrator Director of Marketing Services and Vice President for Institutional Advancement. In view of LaLima's statement that he "recommend[ed] that [Plaintiff] be *allowed to be a candidate* for a new position" (LaLima Aff. ¶ 19) (emphasis added), it would seem that Plaintiff's own witness concedes that Plaintiff had no property rights in the new positions.

Professor Communications" *only* effective September 1996 and September 1997. The record contains no evidence that Plaintiff received any academic appointment after the 1997-1998 school year. Effective September 1998, Plaintiff's appointment was only for Vice President for Marketing and Public Affairs. Plaintiff's response fails to submit any evidence that he maintained the title of Assistant Professor of Communications throughout his employment at the College. Plaintiff's conclusory allegation that he maintained that title is insufficient to raise a triable issue of fact.[10]

Even assuming there is sufficient evidence to raise an issue of fact as to Plaintiff's academic rank, the parties all agree that any right to an academic position is dependent on three conditions: (1) the receipt of a continuing appointment; (2) a request for a teaching position; and (3) the availability of a position in the tenure area. ( *See* Ricippo Aff. ¶ 11; Kreitzer Aff. (Ex. E. toTermini Declar.) ¶ 4.) As set forth above, Plaintiff did not receive a continuing appointment. Moreover, Plaintiff's assertion that he requested to "be transferred to another vacant position as a member of the Communications Arts faculty at [the College's] Western Campus. . ." does nothing to shed light on whether any vacancy existed.

Defendants' motions for summary judgment on the procedural due process claims are granted.

## VI.     Due Process - Liberty Interest

Loss of one's reputation can invoke the protection of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment. *See*

_____

[10] Indeed, LaLima does not state that Plaintiff maintained an academic rank but only that "if Mr. Ricioppo's academic rank had been validated by counsel . . . he would have been eligible for appointment to a faculty position." LaLima Aff. ¶ 17

*Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004). For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment. *Id.*; *see also Morris v. Lindau*, 196 F.3d 102, 114 (2d Cir. 1999). This is the type of claim that is commonly referred to as a "stigma-plus' claim. *See Patterson*, 370 F.3d at 330.

In order to fulfill the requirements of a stigma-plus claim arising from the termination from government employment, a plaintiff must first show that the government made stigmatizing statements about him - statements that call into question plaintiff's "good name, reputation, honor, or integrity." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980). Statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" may also fulfill this requirement. *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996). A plaintiff is generally only required to raise the falsity of these stigmatizing statements as an issue, not prove they are false. *See Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 43 (2d Cir. 1987). Second, a plaintiff must prove these stigmatizing statements were made public. *See Abramson v. Pataki*, 278 F.3d 93, 101-102 (2d Cir. 2002). And third, a plaintiff must show the stigmatizing statements were made concurrently or sufficiently proximate to plaintiff's dismissal from government employment. *Segal v. City of New York*, 459 F.3d 207,212 (2d Cir. 2006); *see Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005); *Martz v. Inc. Vill. of Valley Stream,* 22 F.3d 26, 32 (2d Cir. 1994); *see also Abramson v. Pataki*, 278 F.3d at 101-02 (Stigma-plus plaintiffs must "establish 1) that they were defamed; and 2) that the defamation occurred in the

course of the termination of governmental employment or was coupled with a deprivation of a legal right or status. . . . To show defamation, the plaintiffs must show that the statements complained of were false; that they stigmatized the plaintiffs; and they were publicized.") (citations omitted).

In their motion, Defendants challenge each element required for Plaintiff's stigma-plus claim. That is, Defendants point to the absence of any deposition testimony of plaintiff that false stigmatizing statements were made, that the statements were made publicly and in the course of the termination of plaintiff's employment. Defendants also assert that Plaintiff was not foreclosed from any employment because in February 2005, Plaintiff was hired by the Museums at Mitchell as the Cradle of Aviation's President, a "step-up" from his former position.

In his response, Plaintiff does not direct the Court's attention to any evidence supporting the elements of his stigma-plus claim. Indeed, after stating that procedural due process can require a name clearing hearing when there is public defamation that damages one's reputation plus something more, such as discharge from government employment, the sum and substance of Plaintiff's response to Defendants' argument on this claim is as follows:

> Plaintiff alleges that the abolishment of his position was tantamount to a discharge, especially under the circumstances presented herein; the fact that defendants quickly established a new position with similar duties and did not provide plaintiff with a full-time teaching position, which caused him a period of unemployment.

(Pl. Opp. Mem at 14.)

Conspicuously absent is an reference to defamatory statements, who made such statements, and the circumstances under which they were made so as to establish they were made

33

publicly.  Moreover, the assertions in Plaintiff's affidavit that "[c]ertain members of the Suffolk

County legislature, including Defendants Foley and Fischer made false allegations against me

and caused my alleged conduct to be the subject of inquiry by the Suffolk County Legislature"

and that "[b]eginning in 2001 Defendant Fischer publicly berated me" (Ricioppo Aff. ¶¶ 45-46)

are insufficient to sustain Plaintiff's burden on this motion.  For example, the nature of the

alleged false accusation and exactly when they were made are not disclosed, foreclosing any

conclusion that they were false, stigmatizing and made in connection with the termination of

Plaintiff's employment.

Defendants' motion for summary judgment on Plaintiff's due process liberty interest

claim is granted.

## VII.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free

from "invidious discrimination in statutory classifications and other governmental activity."

*Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (quoting *Harris McRae,* 448 U.S. 207, 322

(1980)).  "The Equal Protection Clause [thus] requires that the government treat all similarly

situated people alike."  *Harlen Assocs. v. Inc. Village of Mineola,* 273 F.3d 494, 499 (2d Cir.

2001).

Defendants' attack on Plaintiff's Equal Protection claim is twofold.  First, it is argued that

the amended complaint fails to adequately allege an Equal Protection claim.  Second, there is no

record evidence to support such a claim.  The Court agrees on both counts.

Plaintiff acknowledges that to establish a prima facie case he must establish "(1) that,

while others similarly situated have not generally been proceeded against because of conduct of

the type forming the basis of the charges against him, he has been singled out for prosecution, **and** (2) that the government's [conduct] has been invidious or in bad faith ,i.e., based upon impermissible considerations."  Pl. Opp. Mem. at 15 (emphasis added) (quoting *Wayte v. United States*, 470 U.S. 598, 609 (1985)).    However, neither the amended complaint nor Plaintiff's opposition papers identify any similarly situated individuals that were treated differently.

Nor is Plaintiff's Equal Protection claim saved by his argument of a "class of one."  "The Supreme Court recently held that the Equal Protection Clause does not apply to a public employee asserting a violation of the Clause based on a 'class of one' theory of liability."  *Appel v. Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008) (citing *Enquist v. Or. Dep't of Agric*., –U.S.–, 128 S. Ct. 2146, 2155-57, 170 L. Ed. 2d 975 (2008)).

Summary judgment is granted in favor of Defendants on Plaintiff's Equal Protection claim.

## VIII.   Section 1985(3)

Count 3 of the Amended Complaint purports to set forth a claim for conspiracy under § 1985(3).  Both Hollander and the County Defendants move for summary judgment on this claim maintaining that there is insufficient evidence of a meeting of the minds to support the claim on conspiracy.

"The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States."  *Brown v. City of Oneonta, New York* , 221 F.3d 329, 341 (2d Cir. 2000) (quoting  *Mian v. Donaldson, Lufkin, & Jenrette Securities Corp.,* 7 F.3d 1085,

1087 (2d Cir. 1993)). Moreover, there must be evidence of "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004); *see also Brown*, 221 F.3d at 341.

The Court need not even reach the question of whether there is evidence of the meeting of the minds. The absence of an equal protection claim and the lack of proof of a discriminatory racial or class-based discriminatory animus are fatal to this cause of action. *See Brown*, 221 F.3d at 341; *Palmieri*, 392 F.3d at 86-87.

Summary judgment in favor of all Defendants in granted on the § 1985(3) claim.

## IX.    Breach of Contract

All parties agree, and the Court concurs, that Plaintiff's state law claim for breach of contract rises or falls with his claim that he had a property interest in continued employment at the College. For the reasons set forth in the discussion of Plaintiff's procedural due process claim, Defendants' motion for summary judgment on the breach of contract claim is granted.

### Conclusion

For the reasons set forth above, Defendants' motions for summary judgment are granted. Upon entry of judgment, the Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      March 4, 2009

/s/ _____
Denis R. Hurley
Senior District Judge